UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff/Respondent,                Cr. No. 16-20322
                                              Honorable Judith E. Levy

           v.

WILLIAM FRANK SNODY,

           Defendant/Petitioner.

| KIMBERLY W. STOUT (P38588) | APRIL N. RUSSO |
|---|---|
| Attorney for Defendant | Asst. U.S. Attorney |
| 370 E. Maple Rd., 3rd Floor | 211 W. Fort Street, Suite 2001 |
| Birmingham, MI | Detroit, MI  48226 |
| (313) 258-3181 | (313) 226-9100 |

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE

Defendant William Frank Snody ("Snody"), through counsel, Kimberly W. Stout, moves this Court for an Order reducing his sentence and releasing him from prison under the compassionate release provisions of 18 U.S.C. § 3582, as modified by the First Step Act. Such an Order is warranted and just due to Snody's serious medical condition.

Pursuant to Local Rule 7.1, the undersigned sought concurrence on this motion by phone call, which was not yet been returned.

Snody requests that this Honorable Court grant his motion for compassionate release.

Respectfully Submitted,

Kimberly W. Stout, P.C.

/s/ Kimberly W. Stout
Kimberly W. Stout (P38588)
*Attorneys for Defendant*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-248-3181

Dated:  June 30, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff/Respondent,          Cr. No. 16-20322
                                     Honorable Judith E. Levy

        v.

WILLIAM FRANK SNODY,

          Defendant/Petitioner.

_____

| | |
|---|---|
| KIMBERLY W. STOUT (P38588) | APRIL N. RUSSO |
| Attorney for Defendant | Asst. U.S. Attorney |
| 370 E. Maple Rd., 3rd Floor | 211 W. Fort Street, Suite 2001 |
| Birmingham, MI | Detroit, MI  48226 |
| (313) 258-3181 | (313) 226-9100 |

_____


**<u>BRIEF IN SUPPORT OF EMERGENCY MOTION FOR</u>**
**<u>COMPASSIONATE RELEASE</u>**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**………………………………………………….……..v

**STATEMENT OF ISSUES**………………………………….………......…vii

**I.    INTRODUCTION AND FACTUAL BACKGROUND**…………..………1

**II.   ARGUMENT**………………………………………………………….……2

**III.  CONCLUSION**……………………………………………………………20

## TABLE OF AUTHORITIES

**Cases**

*In re Manrique,* No. 19-mj-71055-MAG-1 (TSH), 2020 U.S. Dist. LEXIS 50017 (N.D. Cal. Mar. 19, 2020)……………………………………..………….…10

*United States v. Agomuoh*, No. 16-CR-20196 , U.S. Dist. LEXIS 86562 (E.D.Mich. May 18, 2020)……………………………………………………...….. 14

*United States v Bass,* No. 1:10-CR-166 (LEK), 2020 U.S. Dist. LEXIS 102543, at *20 (N.D.N.Y. May 27, 2020)…………………………………………….….5 ..

*United States v Brant,* No. 2:18-CR-20155-TGB-MKM-1, 2020 U.S. Dist. LEXIS 97498, at *13 (E.D. Mich. June 2, 2020)………………………………….………4

*United States v. Doshi,* No. 13-cr-20349, 2020 U.S. Dist. LEXIS 88539E.D. Mich. May 20, 2020)………………………………………………………….……17

*United States v. Goins,* No. 11-cr-20376, 2020 U.S. Dist. LEXIS 100358, at *8-9 (E.D. Mich. June 9, 2020)…………………………………………………………5

*United States v. Jamil*, No. 15-CR-00264-LHK-4, 2020 U.S. Dist. LEXIS 90507 (N.D. Cal. May 21, 2020)…………………………………...………………………...……15

*United States v. Lucas*, No. 15-CR-143, 2020 U.S. Dist. LEXIS 75428 (W.D.N.Y. Apr. 29, 2020)…………………………………………………...………….15

*United States v. Martin,* No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451 (S.D.N.Y. Apr. 10, 2020)………………………………………………………12

*United States v. Paciullo*, No. 15-CR-834 (KMW), 2020 U.S. Dist. LEXIS 65198 (S.D.N.Y. Apr. 14, 2020)………………………………………...……...……3

*United States v. Petrossi*, No. 1:17-CR-192, 2020 U.S. Dist. LEXIS 64972 (M.D. Pa. Apr. 14, 2020)……………………………………………………...……..2

*United States v. Pomante.* No. 19-20316, 2020 U.S. Dist. LEXIS 85626 (E.D. Mich. May 15, 2020), at *15-17…………………………………………...…17

*United States v. Rahim*, No. 16-20433, 2020 U.S. Dist. LEXIS 89355 (E.D. Mich. May 21, 2020)……………………………………………………………….17

*United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa. Apr. 1, 2020)……………………………………..…...……18

*United States v. Sawicz,* No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020) …………………………………………………..…19

*United States v Thaher,* 2020 U.S. Dist. LEXIS 100452, at *14 (S.D.N.Y. June 8, 2020)……………………………………………………………….…..5

*United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414 (C.D. Cal. Apr. 10, 2020)……………………………………….………12

**<u>Statutes and Rules</u>**

18 U.S.C. § 3553(a)……………………………………………..……………*passim*

18 U.S.C. § 3583……………………………………………………..………*passim*

## <u>STATEMENT OF ISSUES</u>

1.    Has Snody demonstrated a compelling and extraordinary circumstance warranting compassionate relief in light of his underlying health conditions, which heighten his risk of developing life-threating conditions should he contract COVID-19?

       Defendant answers, yes.

2.    Has Snody demonstrated that a reduction in sentence would be consistent with the Section 3553(a) factors and policy statements issued by the Sentencing Commission, which require the Court to consider Snody's danger to society and other elements, when Snody has taken steps to effect a positive change while incarcerated and is a minimal risk according the BOP?

       Defendant answers, yes.

## I.    INTRODUCTION AND BACKGROUND

On August 11, 2016, William Snody ("Snody") pled guilty to Receipt of Child Pornography contrary to 18 U.S.C. 2252A(a)(2).   On March 6, 2017, Snody was sentenced to 72 months incarceration to be followed by 8 years supervised release. A Judgment of Conviction and Sentence entered March 14, 2017; an Amended Judgment entered March 24, 2018 correcting the JVTA Assessment. Snody is currently incarcerated at Elkton Federal Correctional Institution in Lisbon, Ohio. Snody urgently moves this Court to grant his compassionate release.

Snody has been in in federal custody since 2017 and is scheduled to be released on June 2, 2021, in one year. Snody has no disciplinary citations and is a low risk for recidivism.  The BOP pattern score for risk is minimum. Mr. Snody has served 60% of his sentence with good time.

Snody is 66 years old (67 on July 25th), weighs 300 pounds (obese), and has hypertension as stated in his Presentence Investigation Report and within his BOP medical records. *See* **Exhibit** (medical records filed under seal by Defendant). He also has sleep apnea and wears a cpap at night. Because of his underlying health conditions, Snody is at high risk for developing severe health complications should he contract COVID-19 in FCI Elkton. Accordingly, he now files this motion in accordance with 18 U.S.C. § 3582(c)(1)(A)(i) for his compassionate release.

1

This Court should grant such relief for the following reasons. First, the exhaustion requirement contained in Section 3582 have been met and Snody was denied release by Warden Mark K. Williams at FCI Elkton. *See* **Exhibit A** (letter of denial). Second, Snody asserts that the global health crisis, in combination with his underlying health conditions constitute compelling and extraordinary circumstances warranting his compassionate release because the conditions make him more susceptible to contracting a severe case of COVID-19. Third, a reduction in Snody's sentence would not be contrary to any of the factors outlined in Section 3553(a) and would be consistent with the Sentencing Commission's policy statement.

## II.    ARGUMENT

### THE GLOBAL HEALTH CRISIS CAUSED BY THE RAPID SPREAD OF COVID-19 TOGETHER WITH SNODY'S COMPROMISED HEALTH WARRANTS A REDUCTION OF SNODY'S SENTENCE

Snody humbly moves this Court to reduce his sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act of 2018 ("FSA"). Prior to the passage of the FSA, only the Director of the Bureau of Prisons ("BOP") could move the court for compassionate release of a defendant. *United States v. Petrossi*, No. 1:17-CR-192, 2020 U.S. Dist. LEXIS 64972, at *8 (M.D. Pa. Apr. 14, 2020). However, the FSA now expressly permits a defendant to directly move the court under § 3582(c)(1)(A)(i). Under normal circumstances, a defendant may only seek such relief from a court if either (1) "the defendant has exhausted all

2

administrative rights to appeal the BOP's failure to bring a motion on his behalf" or

(2) "thirty days have elapsed since requesting that the warden of his facility initiate

such action." *United States v. Paciullo*, No. 15-CR-834 (KMW), 2020 U.S. Dist.

LEXIS 65198, at *4 (S.D.N.Y. Apr. 14, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)).

Snody has exhausted his rights by virtue of his denial attached in **Exhibit A.**

18 U.S.C. § 3582(c)(1)(A) states further that:

> the court . . . may reduce the term of imprisonment . . . after considering
> the factors set forth in section 3553(a) to the extent, they are applicable
> if it finds that . . . such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission.

## 1. The Covid-19 Outbreak Presents A Compelling and Extraordinary Circumstance Which Necessitates Compassionate Release.

We are living in extraordinary times as the COVID-19 pandemic sweeps the

world. At the time of the writing of this Motion, there are close to 9.2 million cases

worldwide and over 479,000 deaths.[1] In the United States alone, there are about 2.43

million cases with over 124,000 deaths and counting. [2]

---

[1] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report – 87, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200416-sitrep-87-covid-19.pdf?sfvrsn=9523115a_2.

[2] Coronavirus Disease 2019 (COVID-19), Cases in the US https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

a.   *Prisons, especially FCI Elkton,  are "Tinder Boxes for Infectious Disease"[3]*

Snody is currently housed at FCI Elkton. The BOP has confirmed 94 inmates and 7 staff members are currently positive for COVID-19. With 9 inmates deaths, FCI Elkton has the third highest mortality rate in BOP custody.  *COVID-19 Cases*, https://www.bop.gov/coronavirus/. **Of the 2238 inmates at Elkton that have been tested, 654 or, 29%, tested positive.** *COVID-19 Inmate Test Information*, https://www.bop.gov/coronavirus/(emphasis suppled).

District Courts continually acknowledge the severity of the issue at FCI Elkton, to wit:

- *United States v. Brant*, No. 2:18-CR-20155-TGB-MKM-1, 2020 U.S. Dist. LEXIS 97498, at *13 (E.D. Mich. June 2, 2020) ("FCI Elkton [remains] a BOP facility that has been hit among the hardest by COVID-19 in terms of prisoners who have died due to the virus.").

- *United States v. Goins*, No. 11-cr-20376, 2020 U.S. Dist. LEXIS 100358, at *8-9 (E.D. Mich. June 9, 2020) (emphasizing that "FCI Elkton [] has experienced a serious outbreak in confirmed

---

[9] *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, at *2 (E.D. Pa. Apr. 1, 2020).

cases of COVID-19" and collecting cases where "district courts have noted the severe situation at FCI Elkton").

- *United States v. Thaher*, 2020 U.S. Dist. LEXIS 100452, at *14 (S.D.N.Y. June 8, 2020) ("The degree and speed of transmission of the virus at FCI Elkton has dwarfed other BOP facilities, which suggests that, however well-thought out, the BOP's COVID-19 Modified Operations Plan is simply not working at FCI Elkton.").

- *United States v. Bass*, No. 1:10-CR-166 (LEK), 2020 U.S. Dist. LEXIS 102543, at *20 (N.D.N.Y. May 27, 2020) ("the COVID-19 outbreak at FCI Elkton, in combination with the special difficulty of social distancing in FCI Elkton's dorm-style environment, weighs heavily in the Court's analysis").

Snody reports to undersigned that he was moved to another unit when an entire unit was quarantined. Yet, the prison "moved several hundred people at once, and no one knew where they were to go. …[Snody] sat for 7 hours while they tried to find [a bed for [him]. …[Everyone] was cross contaminated by this [move]." He also reports that 18 inmates were taken from his unit on June 25, 2020 because they tested positive for COVID-19. Of the 1 of the 18 had the virus before, and 1 had it 3 times before.

This pandemic has for the first time in our lifetimes placed entire states on lock-down. A difference that exists for inmates versus the public, is that inmates cannot practice social distancing, frequent hand washing, and limit exposure to other humans as recommended by all in the medical field including the Center for Disease Control (CDC). Resources such as soaps have always been limited in jails and prisons and will restrict the necessary washing to prevent contracting the virus. And, inmates will continue to be housed in close contact with one another thus allowing the risk of the virus be carried through the air which the CDC advises is possible. The CDC is urging people wear masks. The conditions inherent in a prison setting are contrary to the recommendations of the U.S. Government for preventing the coronavirus.

There are 101 cases at Elkton and there is reason to believe that such reporting does not accurately describe the state of infection within the facility because the BOP is not testing inmates on a large scale. Of the 146,000 inmates in BOP custody, only 2,700 of them have been tested (roughly 1.8%). Of those 2,700 inmates, 2,000 of them tested positive with a positive rate of 70 %. https://twitter.com/OfficialFBOP/status/1256207531820662785?s=20; https://www.nytimes.com/2020/05/03/opinion/andrea-circle-bear-coronavirus-prison.html.

A representative from the BOP confirmed herself that the reporting might not be accurate: "The goal of our reporting is to provide the public with **insight** as to the current status of our COVID-19 response at various facilities. As can be seen from various state websites, for example Maryland, reporting of cases while tied to positive cases, does not necessarily account for unconfirmed (non-tested) cases." "The BOP has 122 facilities spread out across the country and is coordinating with local health departments in each when we identify confirmed positive cases as well as identify symptomatic inmates. With different jurisdictions implementing different testing protocols, and some inclined to forgo routine testing in order to manage limited testing resources as the COVID-19 outbreak continues, we do not plan at this time to provide those figures. I want to point out that any inmate who presents with COVID-19 symptoms will be isolated and treated per CDC guidance." https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#22c48cea7ba3.

The CDC has also recognized that prisons are breeding grounds of infection due to the living conditions. *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. "Correctional and detention facilities can include custody, housing, education,

recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *Id.*

Moreover, there are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions. *Id.*

The virus is sweeping through prisons and a lawsuit was filed by many inmates at FCI Elkton.  In *Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 (N.D. Ohio Apr. 22, 2020), a group of inmates at FCI Elkton brought class action habeas proceeding seeking an injunction forcing FCI Elkton to submit to the court a list of medically vulnerable "subclass members" and subsequently release them. The District Court granted the injunction, limited the subclass to "those identified by the CDC as being at higher risk" which necessarily includes "all Elkton inmates 65 years or older and those with documented, pre-existing medical

8

conditions, including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS, or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher)." At*15. The Court ordered the prison to evaluate each subclass member's eligibility for transfer out of FCI Elkton through any means – compassionate release, parole, transfer furlough. However, the Sixth Circuit has since vacated the injunction issued, finding that the inmates failed to show a likelihood of success on the merits.

In the *Williams* case, it is stated that it is unlikely that the figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available for the testing of Elkton's inmates. At *4-5. 2,400 Everything suggests that if BOP tested as ODRC commendably has, results would show that the virus has become equally widespread within Elkton. However, without testing there is no way to know how many Elkton inmates have the virus. At *5. The Ohio prisons virus response undercuts BOP's ability to argue that testing is either unavailable or is impossible. Why has the Justice Department allocated Elkton an entirely insignificant number of tests while Ohio has been able to pull off mass testing across not only Marion, but at multiple institutions? At *5. While the COVID-19 tests inadequacy is one area of grave concern, testing is only one part of

the multi-faceted approach institutions like Elkton must take to reduce the virus's spread. At *5.

While states like Michigan lock-down to protect their citizens, inmates cannot be isolated and the BOP does not have the ability to practice any of the hygienic and social distancing techniques that the CDC recommends to prevent rapid transmission of COVID-19. Incarcerated individuals have limited or no access to products to sanitize their own environment, and cannot practice social distancing or even control their exposure to large groups. Accordingly, "jail and prisons are powder kegs for infection" and "[r]ealistically the best—perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible." *United States v. Skelos*, No. 15-CR-317 (KMW), 2020 U.S. Dist. LEXIS 64639, at *4 (S.D.N.Y. Apr. 12, 2020) (quoting *United States v. Nkanga*, No. 18-CR-713, 2020 U.S. Dist. LEXIS 56188, at *1 (S.D.N.Y. Mar. 31, 2020)).

To slow the spread of COVID-19, the BOP has instructed its facilities to implement new practices like screening inmates for symptoms. But at least one court has highlighted the inherently problematic nature of such instruction – noting that "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . We don't know who's infected."

*In re Manrique,* No. 19-mj-71055-MAG-1 (TSH), 2020 U.S. Dist. LEXIS 50017, at

*1 (N.D. Cal. Mar. 19, 2020). In fact, Attorney General William Barr even

acknowledged the shortcomings of the BOP's preventative measures, stating that

"[w]hile BOP has taken extensive precautions to prevent COVID-19 from entering

its facilities and infecting our inmates, those precautions, like any precautions, have

not been perfectly successful at all institutions."[4]

The union representing BOP guards across the country recently filed a

lawsuit.  In an Imminent Danger complaint filed with the Occupational Safety and

Health Administration, BOP guards alleged that the agency has

> authorized movement of infected inmates, inmates suspected of being
> infected, inmates who have been in close contact or proximity to
> infected inmates, areas of the Country that do not have any rate of
> infections, or to Institutions that otherwise have not shown signs of any
> introduction of the virus, thus introducing the virus into an uninfected
> area.

OSHA Complaint.

While prison staff, commendably, continue to report to work they do so with

the potential to spread the lethal virus unwittingly. Inmates like Snody, although in

lock-down, still touch phones, computers, and showers that other inmates are using.

However, inmates are not provided soap and can only purchase sanitizing products

in commissary. Inmates who are sick are not tested. Reports have also noted that a

---

[4]*See* supra, note 1.

lock-down on its own may not prevent the spread of COVID-19 even if inmates are housed in individual cells – because they "typically share the same ventilation system with prisoners in other cells."[5] Even with the BOP's precautionary measures, the bottom line is that "individuals housed within our prison systems nonetheless remain particularly vulnerable to infection." *United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414, at *5-6 (C.D. Cal. Apr. 10, 2020). *See also United States v. Martin,* No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451, at *7 (S.D.N.Y. Apr. 10, 2020) ("The crowded nature of federal detention centers . . . present an outsize risk that the COVID-19 contagion, once it gains entry, will spread.").

### b.   *Snody's Underlying Health Conditions*

*Snody is even more at risk than the general population at FCI Elkton for catastrophic health consequences should he contract COVID-19. Snody is 66 years old, has Hypertension, and is obese, among other conditions.* His sealed medical records are replete with references to his high blood pressure/hypertension condition and medications.  On June 25, 2020, the CDC updated its list for people at risk of severe COVID-19 illness. The list included Obesity and high blood pressure. *See* cdc.gov, "CDC updates, expands list of people at risk of severe COVID-19 illness", Press Release, June 25, 2020.

---

[5] *See* Congressional Research Service, *supra* note 13, at 3.

Federal district courts have been granting compassionate release motions based on a movant's heightened risk of infection by COVID-19. In *United States v. Agomuoh*, a 69-year-old at Morgantown inmate was released. He had many health conditions including diabetes, hyperlipidemia, hypertensive heart disease without failure, and atherosclerotic heart disease. The 69-year-old had served 9 months of a 60-month sentence for health care fraud. This Court stated that although there are currently no confirmed cases of COVID-19 at FCI Morgantown, it is not clear whether the facility is conducting widespread COVID-19 tests for inmates or staff. An inmate within FCI Morgantown reported that he had "been transferred within the prison and now has a new roommate. They're sleeping within ten feet of each other. They're eating elbow to elbow . . .. There's no medical treatment after 5:00 PM. He would have to wait until the next day. There's usually—he reports only one doctor on staff with a handful of nurses for the population of I believe almost 700." *Id.* at *7. This Court noted that this statement was not challenged by the government.

"As to FCI Morgantown's lack of confirmed COVID-19 cases, the Court accords no weight to this statistic without evidence that FCI Morgantown has implemented a universal testing regimen." To the contrary, the lack of any confirmed testing at FCI Morgantown "aggravates [the Court's] concerns about Defendant's likelihood to contract COVID-19 while in federal custody." *Id.* at *24.

In *United States v. Jamil*, No. 15-CR-00264-LHK-4, 2020 U.S. Dist. LEXIS 90507 (N.D. Cal. May 21, 2020), the Court by Judge Koh out of California, released a 60 year old at Morgantown with diabetes, high cholesterol, and hypertension who was serving a sentence for conspiracy to traffic in counterfeit goods, and conspiracy to commit criminal copyright infringement. He served only 34 of his 84 -month sentence when he was released. The Court found that "the realities of incarceration prevent imprisoned defendants from engaging in practices that reduce the risk of contracting COVID-19." *Id.* at *6.

In *United States v. Lucas*, No. 15-CR-143, 2020 U.S. Dist. LEXIS 75428 (W.D.N.Y. Apr. 29, 2020), the Court by Judge Vildardo out of New York, released an inmate at Morgantown who was serving time for a drug charge and had diabetes. "Lucas's motion for release asserts that FCI Morgantown does not provide masks to the inmates and that the conditions there make the social distancing required to minimize the risk of contracting COVID-19 nearly impossible. That is not surprising given the challenges social distancing presents in a prison or any facility with many residents." *Id.* at *8.

Further, a 69 year old with chronic kidney disease, hypertension, obesity, and diabetes was released by this Court's Chief Judge. He had served only 2 months out a 12 month sentence for wire fraud. "Even if the Court were to accept the argument that the BOP and FCI Morgantown are taking precautions to ensure the safety of

14

prisoners, Defendant's risk of contracting COVID-19 is not speculative. Until the BOP increases its testing capacity, a lack of confirmed cases has very little bearing on the amount of actual cases in a federal prison. *See* Sadie Gurman, *More Than 70% of Inmates Tested in Federal Prisons Have Coronavirus*, The Wall Street Journal (Apr. 30, 2020), https://www.wsj.com/articles/more-than-70-of-inmates-tested-in-federalprisons-have-coronavirus-11588252023 (explaining that the BOP expects confirmed cases to increase as it increases testing)." *See United States v. Pomante.* No. 19-20316, 2020 U.S. Dist. LEXIS 85626 (E.D. Mich. May 15, 2020), at *16.

Chief Judge Page Hood continued and stated that "as of May 14, 2020, there were 114 confirmed cases of COVID-19 in Monongalia County—the county where [*10] FCI Morgantown is        located. *See* COVID-19,        monchd.org, https://www.monchd.org/covid-19.html. The Court notes that absent zero cases in Monongalia County the prison is still at risk of exposing inmates. *See* Pien Huang, *What We Know About the Silent Spreaders of COVID-19*, NPR (Apr. 13, 2020,                           4:43                           PM), https://www.npr.org/sections/goatsandsoda/2020/04/13/831883560/can-a-coronavirus-patient-who-isnt-showing-symptoms-infect-others    (explaining    that people without symptoms can—and have—spread the virus). Presumably, many of FCI Morgantown's staff live in Monongalia County and may have been exposed

15

to COVID-19." "As for the Government's argument that FCI Morgantown currently has zero confirmed cases of COVID-19, the Court is not persuaded that a lack of confirmed cases is a compelling reason not to grant relief if a defendant otherwise qualifies." Although there are currently no confirmed cases, as an inmate at FCI Morgantown, Defendant may have already been exposed to COVID-19." *United States v. Pomante.* No. 19-20316, 2020 U.S. Dist. LEXIS 85626 (E.D. Mich. May 15, 2020), at *15-17.

Defendant Doshi, a 64-year-old held at FCI Morgantown was released. This Court stated: "The Government has responded that the facility where Doshi is held, FCI Morgantown, has zero confirmed cases of COVID-19. This fact is meaningless, however, for there is no evidence of how many inmates have been tested." *United States v. Doshi*, No. 13-cr-20349, 2020 U.S. Dist. LEXIS 88539E.D. Mich. May 20, 2020

In *United States v. Rahim*, No. 16-20433, 2020 U.S. Dist. LEXIS 89355 (E.D. Mich. May 21, 2020), having just started to serve his 72-month sentence in January of 2019, Judge Edmunds released 67-year-old Rahim incarcerated for charges related to a kick back scheme. Rahim has COPD, diabetes, hypertension, congestive heart failure and "The Court recognizes and acknowledges the Government's [*9] argument that FCI Morgantown currently has zero confirmed cases of COVID-19. But the Court is not persuaded that a lack confirmed cases alone

is a compelling reason not to grant relief if a defendant otherwise qualifies"

In *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, at *24 (E.D. Pa. Apr. 1, 2020), the Pennsylvania Court granted compassionate release to an inmate at FCI Elkton who had diabetes, high blood pressure, and liver abnormalities. He was 17 years into a 20 year sentence.  The Court noted that "[t]he situation at FCI Elkton in particular is alarming. The first cases of COVID-19 appeared there *after* the government assured the Court that the BOP was taking aggressive action to contain the disease. Elkton is filled to capacity and appears to have few tests. Mr. Rodriguez represents that inmates at Elkton do not have adequate soap or disinfectant, are still housed together in large groups, and share a thermometer without sanitization, against critical public health recommendations." At *24.

Such cases illustrate that although various health conditions can be generally manageable, like hypertension, the COVID-19 crisis has turned health conditions potentially deadly.

## 2.    A Sentence Reduction Is Also Consistent with the Sentencing Commission's Policy Statements and the Factors Outlined in 18 U.S.C.S. § 3553(a).

In addition to finding a compelling and extraordinary circumstance warranting compassionate relief, a court considering a defendant's motion under Section 3582(c)(1)(A) of 18 United States Code, must decide whether a sentence reduction

would "be consistent with the applicable policy statements issued by the Sentencing Commission" and supported by the "factors set forth in section 3553(a)." § 3582(c)(1)(A).

### a.   *Policy Statements*

Section 3582(c)(1)(A) is accompanied by a policy statement and commentary promulgated by the Sentencing Commission. The relevant section states that a court may reduce a sentence for "extraordinary and compelling reasons," including situations where an individual is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A).

As already stated, Snody has an increased risk for developing life-threatening conditions should he contract COVID-19 due to hypertension, obesity, and other conditions, as well as advanced age. If infected with a severe or debilitating case of COVID-19, Snody will certainly have a difficult time recovering and/or caring for himself. Accordingly, the defendant urges this Court to find that "the risk of serious illness or death he faces in prison" qualifies as an extraordinary or compelling reason, favoring his early release. *United States v. Sawicz,* No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020) at 7.

### b.    *§ 3553(a) Factors*

Similarly, the application of the § 3553(a) factors mitigates towards Snody's compassionate release. In considering what is "sufficient but not greater than necessary, to comply with the purposes of [sentencing]", § 3553(a) instructs a court to consider the following:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed—
>
> > **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > **(B)** to afford adequate deterrence to criminal conduct;
> >
> > **(C)** to protect the public from further crimes of the defendant; and
> >
> > **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> **(3)** the kinds of sentences available;
>
> **(4)** [the kinds of sentence and sentencing range provided for in the USSG]
>
> **(5)** any pertinent [Sentencing Commission policy statement]
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> **(7)** the need to provide restitution to any victims of the offense

*Sawicz*, 2020 U.S. Dist. LEXIS 64418 at 7, 8 (summarizing § 3553(a)).

## HISTORY (18 U.S.C. 3553(a)(1))

Currently, the Defendant has a stable home with his wife whom undersigned has spoken to and confirmed.

## DANGER TO COMMUNITY (19 U.S.C. 3553(a)(2)(C)

Snody acknowledges the serious nature of the crimes he committed which landed him behind bars. However, he chose to plead guilty to his crime and accepted responsibility. He has no disciplinary record whatsoever in prison and he is not likely to be a recidivist. Snody has taken several classes while incarcerated to better himself including drug education and behavior modification. The BOP rates his risk minimal.

## III.   CONCLUSION

For the foregoing reasons, Defendant requests that this Honorable Court enter an order reducing his sentence and granting compassionate release.

Respectfully Submitted,

Date: June 30, 2020                          KIMBERLY W. STOUT, P.C.

/s/ Kimberly W. Stout
Kimberly W. Stout (P38588)
*Attorney for Defendants*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009

**PROOF OF SERVICE**

I hereby certify that on June 30, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Kimberly W. Stout
KIMBERLY W. STOUT (P38588)
*Attorney for Defendants*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-258-3181

21