UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

            Plaintiff,           Case No. 16-20322

v.

                             Hon. Judith E. Levy
William Frank Snody,         United States District Judge

            Defendant.
_____

**United States' Response Opposing
the Defendant's Motion for Compassionate Release**
_____

William Snody spent at least 15 years amassing a large and disturbing collection of over 780,000 images of child pornography. (PSR ¶ 11). He possessed an image of a tied-up naked toddler with an adult ready to penetrate the child with his penis, a video with a small blond haired girl with a chain around her neck performing oral sex on a dog, videos of young girls being raped, and at least one video of a young girl being penetrated vaginally with objects, one of which caused her to bleed. (R. 41: Govt. Sentencing Mem., Pg.ID 664-666).

Law enforcement recovered these images after discovering that Snody had spent 35 hours on a child pornography website in less than

1

six weeks in 2015. *Id.* at 662. Agents executed a warrant on his house in November 2015. *Id.* Snody's house had a video recorder and recording equipment in the basement, and he had a bedroom in the upstairs of the residence that a telescope and a bed with two children's stuffed animals on it. *Id.* Snody admitted to possessing child pornography and failed a polygraph examination as to whether he had sexual contact with a child while he was an adult. *Id.* at 663.

Snody pleaded guilty to receipt of child pornography on August 11, 2016. His sentencing guidelines were 121 – 151 months in federal prison and the government recommended 121 months' imprisonment. This Court sentenced Snody to 72 month in federal prison on March 6, 2017.

Snody was out of custody during the pendency of his case and began serving his current sentence on April 25, 2017. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Snody does not qualify for compassionate release.

Although Snody's heightened risk from Covid-19 may qualify as an "extraordinary and compelling reason[]" for release under 1B1.13(1)(A)

& cmt. n.1(A) under many circumstances, Snody has acquired and appears to have recovered from Covid-19, which means that there are no extraordinary and compelling reasons to release him. Snody's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2), because he committed an enormously serious offense by possessing extraordinarily heinous images involving the rape of children, and is a threat to reoffend if released. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because his offense was too serious for early release, and because he has served so little of the Court's 72 month sentence .

The Bureau of Prisons has also taken significant steps to protect all inmates, including Snody, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety,

and can safely be granted home confinement. As of July 13, 2020 this process has already resulted in at least 6,852 inmates being placed on home confinement. *See* BOP Covid-19 Website. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 2020 WL 3056217, at \*11—the Court should deny Snody's motion for compassionate release.

## Background

Law enforcement discovered through another investigation that Snody had spent 35 hours on a child pornography website in less than six weeks in 2015. (R. 41: Govt. Sent. Mem; Pg.ID 662). Agents executed a warrant on his house based off that information in November 2015. *Id.*

Upon entering his house, agents recovered DVD's and electronic devices belonging to Snody. They also observed that the residence had a video recorder and recording equipment in the basement, and that Snody's residence contained a bedroom in the upstairs of the residence that a telescope and a bed with two children's stuffed animals on it, and nothing else. *Id.* at 662. Snody had no children. (PSR ¶ 38).

4

Snody admitted to possessing child pornography and failed a polygraph examination as to whether he had sexual contact with a child while he was an adult. (R. 41: Govt. Sentencing Mem., Pg.ID 663).

Upon reviewing his storage devices, agents discovered that Snody possessed an image of a tied-up naked toddler with an adult ready to penetrate the child with his penis, a video with a small blond haired girl with a chain around her neck performing oral sex on a dog, and videos of young girls being raped and at least one video of a young girl being penetrated vaginally with objects, one of which causes her to bleed. (R. 41, Govt. Sentencing Mem., Pg.ID 664-666). Snody possessed a total of 780,101 child pornography images on 30 blue ray discs.

This Court sentenced Snody to 72 month in federal prison on March 6, 2017, after Snody pleaded guilty to one count of receipt of child pornography.

Snody began serving his prison sentence on April 25, 2017, and is currently incarcerated at FCI Elkton He is 66 years old, and his projected release date is June 2, 2021. Snody has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Snody has conditions that make him susceptible to severe

illness from Covid-19, but he has already acquired and recovered from Covid-19, though it appears he still tests positive. That he has already had a significant Covid-19 illness means that he is likely immune for some time from Covid-19 and the circumstances are not extraordinary and compelling to release him at this time. He has properly exhausted his administrative remedies and this Court can rule on his motion on the merits.

## Argument

I. **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

   A. **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk

6

of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP
Covid-19 Modified Operations Website. Since then, as the worldwide
crisis has evolved, the Bureau of Prisons has repeatedly revised its
plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease,
the Bureau of Prisons has restricted inmate movement within and
between facilities. *Id.* When new inmates arrive, asymptomatic inmates
are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic
inmates are provided with medical evaluation and treatment and are
isolated from other inmates until testing negative for Covid-19 or being
cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations
to maximize physical distancing, including staggering meal and
recreation times, instating grab-and-go meals, and establishing
quarantine and isolation procedures." *Id.* Staff and inmates are issued
face masks to wear in public areas. *See* BOP FAQs: Correcting Myths
and Misinformation. Staff and contractors are screened for symptoms,
and contractors are only permitted to access a facility at all if
performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social
and legal visits have been suspended to limit the number of people

entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

FCI Elkton has been particularly hard-hit by Covid-19, but officials there have put several measures into place to limit the further spread of Covid-19. Elkton has taken numerous steps to limit the transmission of Covid-19 to the 2500 inmates at the facility. *See Williams v. Wilson,* Application For Stay, 19A1041, at 10-12. Inmates have access to disinfectant to clean their living space, eat meals in their living area instead of a common area, and mealtimes are staggered so that only one housing unit is moving around the facility bat one time. Elkton staff have been working 12-hour shifts to provide inmates with 24-hour care,

isolating symptomatic individuals and not releasing those who have returned from hospital care to the general population until they are fever-free for 72 hours.

Officials at FCI Elkton have worked hard to limit the spread of Covid-19 and continue to do so. Snody's medical records from 2019 and 2020 demonstrate the Bureau of Prisons sends Covid-19 prisoners to outside medical facilities when appropriate. FCI Elkton has had tremendous challenges with Covid-19, which sadly does not make it unique amongst American institutions, penal or otherwise.

### B.   The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 6,852 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and

11

circumstances that are most urgent. For any inmate who is a candidate
for home confinement, the Bureau of Prisons must first ensure that his
proposed home-confinement location is suitable for release, does not
place him at an even greater risk of contracting Covid-19, and does not
place members of the public at risk from him. It must assess
components of the release plan, including whether the inmate will have
access to health care and other resources. It must consider myriad other
factors, including the limited availability of transportation right now
and the probation department's reduced ability to supervise inmates
who have been released. All of those decisions require channeling
resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult
even in normal circumstances. That is why Congress tasked the Bureau
of Prisons to make them and has not subjected the decisions to judicial
review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of
law, a designation of a place of imprisonment under this subsection is
not reviewable by any court."); *United States v. Patino*, No. 18- 20451,
2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule,
the Court lacks authority to direct the operations of the Bureau of

Prisons."). It is especially true now, given the Bureau of Prisons'

substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Snody's motion for compassionate release.

Snody's motion for a reduced sentence should be denied. A district

court has "no inherent authority . . . to modify an otherwise valid

sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir.

2009). Rather, a district court's authority to modify a defendant's

sentence is "narrowly circumscribed." *United States v. Houston*, 529

F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception,

a district court "may not modify a term of imprisonment once it has

been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are

narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001).

Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally

narrow.

Snody must show "extraordinary and compelling reasons" for

compassionate release, and release must be "consistent with" the

Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

As with the identical language in § 3582(c)(2), compliance with the

policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See*

13

*Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

Even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Snody is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling

reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well

developing "the criteria to be applied and a list of specific examples" for

when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's

directive in USSG § 1B1.13, that policy statement is mandatory. Section

3582(c)(1)(A)'s reliance on the Sentencing Commission's policy

statements mirrors the language governing sentence reductions under

18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare*

§ 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same

language in the same statute, it must be interpreted in the same way.

*Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing

Commission's restraints "on a district court's sentence-reduction

authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711

(6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could

move for compassionate release under § 3582(c)(1)(A). It did not amend

the substantive requirements for release. *United States v. Saldana*, No.

19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United*

15

*States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in [Program Statement 5050.50](). USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Snody and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail

16

the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

Snody's medical records, however, confirm that he has morbid obesity, which the CDC has identified as a risk factor for Covid-19. Snody has other conditions which he claims enhance his risk for severe illness from Covid-19, but his obesity appears to be the only one that definitively raises his risk according to the CDC. Under most conditions, Snody would have satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

Here, though, Snody has already contracted, been hospitalized for, and apparently recovered from Covid-19. (See 2020 Sealed Medical Record). Snody was hospitalized in April 2020 and his medical records show that he continues to test positive but displays no other symptoms. It is likely Snody has built up antibodies to Covid-19 for at least some period of time. As Paul Hunter, a professor in medicine at the University of East Anglia noted, "[T]he question is not whether you become immune, it's how long for.". https://www.bbc.com/news/health-52446965. It does not appear likely that individuals can immediately

17

catch Covid-19 again, though the period of resistance to the virus is unknown at this time. On March 26, 2020, while appearing on The Daily Show with Trevor Noah, Dr. Anthony Fauci, the director of the National Institute for Allergy and Infectious Diseases, told Noah, "So, it's never 100 percent, but I'd be willing to bet anything that people who recover are really protected against reinfection." Johns Hopkins University School of Public Health states that it is "expected that there will be a low possibility of reinfection, but this is not known yet for sure." https://www.jhsph.edu/covid-19/questions-and-answers/index.html. "As far as I know, there are no confirmed cases of anyone getting sick, then better, then sick again with a confirmed live virus," says Lee Riley, MD, a professor and chair of the Division of Infectious Disease and Vaccinology at the UC Berkeley School of Public Health.

Another court recently noted about reinfection that it was convincing that over 12 million people have been infected with COVID-19 and we are not seeing media reports on wide-spread reinfections. *United States v.* Littrell, No. 3:18-CR-00123-JO, 2020 WL 3889053, at *4 (D. Or. July 10, 2020) (denying compassionate release for child pornography inmate

18

who already contracted Covid-19). In other words, reinfection is speculative, and the possibility of reinfection does not rise to the level of extraordinary and compelling circumstance warranting release.

On May, 28, 2020, Judge Goldsmith rejected an inmate's request for compassionate release after the inmate tested positive for and recovered from Covid-19 after filing his motion, noting that it is unlikely he would reacquire the infection based on CDC guidance and because of precautions taken by the BOP. *United States v. Bland,* 18-cr-20555, Opinion and Order and Denying Defendant's Motion for Compassionate Release (Attached as Exhibit 1). This Court should do likewise.

But Snody also remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive

19

view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders— such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7.

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Snody's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). "Federal courts have been disinclined to grant compassionate release to petitioners

convicted of crimes involving child pornography, even for vulnerable petitioners during the COVID-19 pandemic, citing potential dangerousness." *Coleman v. United States*, 2020 WL 3039123, at *4 (E.D. Va. June 4, 2020); *see also United States v. Ciccone*, 2020 WL 1861653, at *3 (N.D. Ohio Apr. 14, 2020). Courts are particularly disinclined to release inmates to the place where they committed the offense or without a detailed plan to prevent reoffending. *See, e.g.*, *United States v. Mitchell*, 2020 WL 2770070, at *4 (E.D. Cal. May 28, 2020) (denying compassionate release where the inmate proposed returning to the same home where he committed the crime without a plan to prevent reoffending); *United States v. Feiling*, 2020 WL 1821457, at *8 (E.D. Va. Apr. 10, 2020) (denying compassionate release in part because the inmate wanted to return to the home where he committed his offense); *United States v. Hylander*, 2020 WL 1915950, at *3 (S.D. Fla. Apr. 20, 2020) (denying a motion for compassionate release because the inmate proposed returning to the location of his offense). And "given the ease with which child pornography is accessible in the modern world," releasing such offenders "is likely to require stringent and frequent monitoring," which creates a safety risk for the officers

21

tasked with that responsibility during a health pandemic. *United States v. Sears*, 2020 WL 3250717, at *3 (D.D.C. June 16, 2020); *see also United States v. Meizin*, 2020 WL 1985042, at *5 (N.D. Ohio Apr. 27, 2020) (denying compassionate release because of the easy access to electronic devices). Here, it appears that Snody's release plan is to return home with his wife, and the risk is too great that he will begin again to acquire images of child pornography.

Snody is not eligible for compassionate release.

### C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v.*

22

*Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Snody eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Further, while Snody is only a little over a year from his release because of his participation in the RDAP program, he has served only 39 months out of the 72 months that this Court ordered him to serve. With respect to child pornography offenders, courts have typically refused to release inmates with a significant portion of their sentence remaining. *Compare Hull*, 2020 WL 2475639, at *3 (refusing to release an inmate who had "only served a little over half of his 60-month sentence" for receipt of child pornography) *and United States v. Riter*, 2020 WL 3428144, at *4 (S.D.N.Y. June 23, 2020) (refusing to release an inmate at FCI-Elkton who had served roughly one third of his sentence for receipt, distribution, and possession of child pornography) *with United States v. Pippin*, 2020 WL 2602140, at *3 (W.D. Wash. May

23

20, 2020) (releasing inmate who had served 70 percent of his sentence for possession of child pornography) *and United States v. Feucht*, 2020 WL 2781600, at *4 (S.D. Fla. May 28, 2020) (releasing inmate who had served about 86 percent of his sentence for distribution of child pornography).

In a recent case, an Indiana court—after noting that FCI Elkton was not on anyone's must-visit places for summer 2020---refused an inmate's motion for compassionate release, in part noting as a factor under 18 U.S.C. § 3553(a) that the inmate "possessed large amounts of child pornography, depicting some of the most despicable images imaginable." *United States v. Tranter*, No. 1:17-CR-22-HAB, 2020 WL 3841268, at *4 (N.D. Ind. July 8, 2020)

Like Tranter, Snody was a prolific collector of the most heinous images of child pornography. As noted in the government's original sentencing memorandum, "An offender's pornography and erotica collection is the single best indicator of what he wants to do." See Lanning, Kenneth V., *Child Molesters: A Behavioral Analysis – For Professionals Investigating the Sexual Exploitation of Children*, Office of Juvenile Justice and Delinquency Prevention, Fifth Ed. 2010, at 107.

Numerous studies demonstrate that even though an offense does not involve hands on contact with a minor, it does not mean that Snody has not had a hands on offense with a child in the past. (R. 41: Gov. Sent. Mem., Pg.ID 674). Snody's collection---even for those individuals experienced with these type of cases---is enormous and the nature of some of his images more disturbing than that of many defendants. Release after 40 months under these circumstances unduly depreciates the serious nature of his offense and places the public at risk of Snody re-offending.

## Conclusion

Snody's motion should be denied.

Respectfully Submitted,

MATTHEW SCHNEIDER
United States Attorney

Dated: July 13, 2020

s/CHRISTOPHER RAWSTHORNE
Assistant United States Attorney
600 Church Street
Flint, MI 48502
Telephone number: (810) 766-5035
Email:Christopher.Rawsthorne@usdoj.gov
WI BAR # 1059889

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2020, the foregoing document was electronically filed by an employee of the United States Attorney's Office with the Clerk of the Court using the ECF system which will send notification of such filing to:

Kimberly Stout

s/CHRISTOPHER RAWSTHORNE
United States Attorney's Office